■ In the Matter of ASHLYN Q., a Child Alleged to be a Abused and/or Neglected. CLINTON COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent; TALIA R., Appellant. (Proceeding No. 1.) In the Matter of ASHLYN Q. and Another, Children Alleged to be Abused and/or Neglected. CLINTON COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent; ARTHUR Q., Appellant. (Proceeding No. 2.) (And Another Related Proceeding.) [13 NYS3d 630]—

Rose, J. Appeals (1) from three orders of the Supreme Court (Lawliss, J.), entered July 29, 2013 and August 21, 2013 in Clinton County, which, among other things, granted petitioner's applications, in two proceedings pursuant to Family Ct Act article 10, to adjudicate Ashlyn Q. to be an abused and ne-

glected child and Yuri Q. to be a derivatively abused and neglected child, (2) from two orders of protection issued thereon, and (3) from an order of said court, entered August 21, 2013 in Clinton County, which, among other things, placed respondent Arthur Q. under petitioner's supervision for a period of one year.

Respondent Talia R. (hereinafter the mother), who is the mother of Ashlyn Q. (born in 2012), resided with respondent Arthur Q. (hereinafter the fiancé), the father of Yuri Q., his son from another relationship. On February 6, 2013, the mother and the fiancé were caring for six-month-old Ashlyn when the child woke up crying at approximately 4:00 a.m., a time that was unusual for her normal routine. While tending to her, the mother noticed that Ashlyn was not able to use her arm properly, which prompted the mother and the fiancé to take the child to the emergency room. Eventually, Ashlyn's arm was X-rayed, revealing that she had suffered a transverse fracture of her left humerus bone. Petitioner thereafter commenced these proceedings and, following a fact-finding hearing, both the mother and the fiancé were found to have abused and neglected Ashlyn. The fiancé was also found to have derivatively abused and neglected Yuri. A combined permanency and dispositional hearing was held, and corresponding orders of disposition, permanency and protection were issued. The mother and the fiancé now appeal.

In Family Ct Act article 10 proceedings, a petitioner establishes a prima facie case of child abuse or neglect when it proves by a preponderance of the evidence that the subject child suffered an injury "which would ordinarily not occur absent an act or omission of [the] respondents, and . . . that [the] respondents were the caretakers of the child at the time the injury occurred" (*Matter of Philip M.*, 82 NY2d 238, 243 [1993]; *see* Family Ct Act § 1046 [a] [ii]; [b] [i]). If a petitioner carries this initial burden, it then falls to the respondents to rebut the presumption of culpability by offering a reasonable and adequate explanation for how the child sustained the injury (*see Matter of Nicholas S. [John T.]*, 107 AD3d 1307, 1310 [2013], *lv denied* 22 NY3d 854 [2013]; *Matter of Izayah J. [Jose I.]*, 104 AD3d 1107, 1109 [2013]).

Here, petitioner offered the expert testimony of Karyn Patno, a board-certified pediatrician. After examining Ashlyn and interviewing the mother, who offered no explanation as to how the child's humerus fracture might have occurred, Patno testified that Ashlyn was developmentally incapable of inflicting such an injury on herself and that the injury was likely nonac-

cidental. Patno further opined that Ashlyn's injury occurred between 1:00 a.m. and 4:00 a.m. on the morning of February 6, 2013, when she was, undisputedly, under the exclusive care of the mother and the fiancé. Her conclusion as to the timing of the injury was based on an assessment of the child's X rays, which revealed that the fracture was a recent one, and the mother's comments to her that Ashlyn had been behaving normally for the entire preceding day, including when the child awoke for a feeding at about 1:00 a.m., at which time both the fiancé and the mother had attended to her. Patno testified that the mother told her it was only when Ashlyn awoke crying for a second time around 4:00 a.m. that she noticed a problem with Ashlyn's arm.

Petitioner's evidence also included statements from the fiancé's mother (hereinafter the grandmother) that, in October 2012, the fiancé told her that he had picked up the then-three-month-old child "and shook her then threw her into the crib" because she would not stop crying. A caseworker for petitioner also testified that the fiancé further confessed to police that he had previously shaken Ashlyn, and that the mother had told the caseworker that she knew what the fiancé had done. Despite this testimony and the fact that this prior incident was apparently serious enough for the mother, grandmother and fiancé to agree that he should not take care of Ashlyn by himself, the fiancé refused to acknowledge at the fact-finding hearing that he had shaken Ashlyn, and the mother denied any knowledge of the incident when confronted about it by police, testifying instead that she first learned of it when the police told her what had happened. The fiancé did, however, acknowledge other past violent outbursts, including an instance where he was charged with attempted assault for kicking and denting the door of Yuri's biological mother's car while both she and Yuri were inside, and another where, after Yuri damaged a television with a toy, the fiancé sent Yuri to his room and threw the toy down the hallway after him. The fiancé also admitted to punching a hole in the wall of his residence in frustration, and to throwing a television remote after an argument with the grandmother. Indeed, the grandmother testified that she is afraid of her son.

In response, neither the mother nor the fiancé disputed Patno's opinions regarding the nonaccidental nature of Ashlyn's February 2013 injury, and their testimony regarding the chronology of events leading up to the discovery of the injury was consistent with that which contributed to Patno's conclusions. The only alternate explanation for the injury that either

party raised—aside from maintaining that they had no idea how Ashlyn suffered a fractured humerus—is that the injury must have occurred when she was being cared for by the grandmother on the morning of February 5, 2013, which accusation the grandmother denied. Supreme Court discredited the mother's and the fiancé's testimony in this regard, a determination to which we will defer in light of their failure to offer an adequate explanation as to what actually caused Ashlyn's injury, and because their credibility was further undermined by their responses to the evidence of the fiancé's prior violent behavior.

In light of the foregoing, we find that the mother and the fiancé failed to rebut petitioner's prima facie case against them and that a preponderance of the evidence supports Supreme Court's finding that they abused and neglected Ashlyn (*see Matter of Brayden UU. [Amanda UU.]*, 116 AD3d 1179, 1181-1182 [2014]; *Matter of Alexander F. [Raddad I.]*, 82 AD3d 1514, 1516-1517 [2011]; *Matter of Keone J.*, 309 AD2d 684, 686-687 [2003]). For the same reasons, we find no abuse of discretion in Supreme Court's determination that, in order to protect Ashlyn from the potential threat of future abuse or neglect, it was in her best interests to deny visitation to the fiancé, who is not Ashlyn's biological father (*see Matter of Victoria XX. [Thomas XX.]*, 110 AD3d 1168, 1171-1172 [2013]; *Matter of Kathleen OO.*, 232 AD2d 784, 786 [1996]), and to limit the mother to supervised visitation (*see Matter of Raychelle J. v Kendell K.*, 121 AD3d 1206, 1207-1208 [2014]; *Matter of Isaac Q.*, 53 AD3d 731, 732 [2008]; *Matter of Pettengill v Kirley*, 25 AD3d 935, 935-936 [2006]).

Further, we decline to disturb Supreme Court's finding that the fiancé derivatively abused and neglected Yuri, inasmuch as his conduct and lack of accountability therefor "demonstrates such an impaired level of parental judgment as to create a substantial risk of harm for any child in [his] care" (*Matter of Loraida R. [Lori S.]*, 97 AD3d 925, 927 [2012] [internal quotation marks, brackets and citations omitted]; *see Matter of Marino S.*, 100 NY2d 361, 374 [2003], *cert denied* 540 US 1059 [2003]). The mother's allegation of bias on the part of the court is unpreserved for our review, inasmuch as she never objected or otherwise moved for Supreme Court's recusal from these proceedings (*see Matter of Kimberly Z. [Jason Z.]*, 88 AD3d 1181, 1184 [2011]). Finally, because the orders of protection expired by their own terms in March 2014, the appeals from them are moot and must be dismissed (*see Matter of Damian D. [Patricia WW.]*, 126 AD3d 12, 15 [2015]).

Peters, P.J., McCarthy and Egan Jr., JJ., concur. Ordered that the appeals from the orders of protection entered August 21, 2013 are dismissed, as moot, without costs. Ordered that the orders entered July 29, 2013 and the remaining orders entered August 21, 2013 are affirmed, without costs.